IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SALVATORE CARMELO MAGGIO,

    Petitioner,                   2: 09 - cv - 1606 - LKK TJB

  vs.

KATHLEEN DICKINSON,

    Respondent.                FINDINGS AND RECOMMENDATIONS

_____/

## I. INTRODUCTION

Petitioner, Salvatore Carmelo Maggio, is a state prisoner and is proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was found guilty of second degree murder by a jury and is currently serving a sentence of fifteen years to life imprisonment. Petitioner raises two claims in this federal habeas petition; specifically: (1) Petitioner's due process rights were violated when the trial court erred in instructing the jury on imperfect self-defense ("Claim I"); and (2) Petitioner was denied the right to testify on his own behalf ("Claim II"). For the following reasons, the petition should be denied.

//

//

//

## II. FACTUAL BACKGROUND[1]

Nick Murray, age 15, met his friend Aaron Brooks at Canyon Creek Park in Galt on the afternoon of October 26, 2005. Brooks had his skateboard that day. Murray was there with another friend, 15-year-old Chris Duro, and the three went to Emerald Vista Park. As Murray, Duro and Brooks walked through the park, they encountered defendant sitting on a bench, who walked up to them and asked if they had any marijuana for sale. Brooks said they did not, but he could find some, and after making a few calls, arranged a sale. Murray then left, as it was starting to rain.

Brooks, Duro and defendant walked to Galt Community Park. About five minutes later, a man showed up and Duro and defendant purchased some marijuana from him. Duro then left to go to a friend's house while Brooks and defendant continued walking.

Jason Brooks last saw his 15-year-old brother Aaron at around 5:30 p.m. on October 26, 2005, leaving their house near Emerald Vista Park. He reported Brooks missing the following day.

On November 5, 2005, a search party found Brooks's body in a creek at Emerald Vista Park. An autopsy of Brooks's mildly decomposed body found no offensive wounds to the hands. Discoloration on his larynx was a sign of strangulation, and the cause of death was drowning.

On October 25, 2006, between 3:00 and 5:00 p.m., Brandon Smith was walking one of his dogs through Emerald Vista Park when he noticed a skateboard, beanie, and marijuana pipe which had not been there 30 minutes ago. Continuing his walk, Smith eventually found defendant sitting in the creek behind a shrub. Asked by Smith what happened, defendant told Smith he was jumped by three people and thrown into the creek. Defendant, who was covered in algae and moss, got out of the creek with no trouble and picked up the beanie and pipe.

After defendant told Smith he thought he broke his arm, Smith called 911. Officer Steve Morgan of the Galt Police Department responded to the 911 call at around 5:30 p.m. Defendant was sitting on a park bench, wet and covered with algae, and vomited when Officer Morgan asked how he was.

Defendant told the officer he had been in a scuffle with two men after an argument over buying marijuana. He fell into the creek

---

[1] The factual background is taken from the California Court of Appeal, Third Appellate District opinion dated February 11, 2009 and attached to Respondent's answer as Exhibit A (hereinafter the "Slip Op.").

2

after the two men left, but had not been in a fight.

A paramedic asked defendant if all the items on the pathway, including the skateboard, were his. Defendant said yes, and took them. The paramedic observed no injury other than an abrasion on defendant's right wrist.

Defendant was interviewed by law enforcement officers on November 5, 2005. He had driven to Galt and brought a smoothie at a coffee shop. Defendant then ran into someone at Raley's, and asked the person if he could buy marijuana. The person did not smoke, so defendant asked the person's friend, Brooks.

Brooks made a call and they walked to pick up the marijuana from another person. Defendant thought he was being set up, so he took the marijuana, pushed Brooks, and took his skateboard. They then "tussled," with both ending up in the water.

Defendant said they got exhausted and began to choke each other while still in the water. He claimed to have swallowed a lot of water, causing him to see a white light before regaining his strength and throwing Brooks off of him.

He was now able to push Brooks underwater. Defendant thought Brooks might die as a result, and "Probably at that moment" hoped Brooks would die. When Brooks was lying face down in the water, defendant let him go, realizing he was dead.

Defendant first claimed he did not know what happened to Brooks, but later admitted thinking Brooks was faking death, and then finally admitting he knew Brooks was dead.

Defendant's home was searched and police found a shirt, pants, beanie, tennis shoes, a bag of marijuana, and Brooks's skateboard in a dumpster behind the house.

Defendant presented a mental state defense.

His mother testified she put him in therapy during his senior year in high school. In the year before defendant killed Brooks, defendant displayed no animation and had a detached look in his eyes. The treating psychologist diagnosed defendant with depressive disorder, not otherwise specified, and recommended antidepressants and continued counseling.

Defendant's grandparents testified to his passive and nonconfrontational personality. A year before the incident, defendant's grandmother saw him pointing at unseen things and acting as if he was being watched.

Dr. Katherine Warburton was appointed by the court to determine

if he was competent to stand trial. Dr. Warburton found defendant competent to stand trial but suffering from paranoid schizophrenia. Paranoid schizophrenia can influence one's cognitive abilities by creating paranoid delusions. For example, upon being handed a bottle of water the paranoid schizophrenic may believe it contains something inappropriate.

In a jail interview, defendant told Dr. Warburton that his father was starting to control his mind. Defendant would watch the Regis and Kelly show on television, and Kelly would talk with him. He also heard voices commenting on his thoughts and interactions with others. Dr. Warburton concluded defendant was under the influence of his mental disease before the incident.

Dr. Jules Burnstein testified as an expert in clinical and forensic psychology and interviewed defendant five times after his arrest. Defendant, who was timid, shy and introverted, suffered from paranoid schizophrenia. Defendant's jail psychiatric records indicate he had images of his cutting off body parts, as well as audio hallucinations and paranoid thoughts. There was no evidence of malingering or falsifying his mental illness.

In an interview with Dr. Burnstein, defendant admitted he did not think Brooks was trying to drown him during the fight. Defendant thought he was swallowing water and dying. After purchasing the marijuana, defendant asked Brooks to smoke some to ensure the marijuana was not adulterated. When Brooks refused, defendant thought he was being set up, so he chased Brooks, grabbed his skateboard, and an altercation ensued. Asked why he held Brooks's head under water, defendant said he was baptizing him.

(Slip Op. at p. 2-6.)

### III. PROCEDURAL HISTORY

Petitioner appealed his judgment and conviction to the California Court of Appeal, Third Appellate District raising the same two issues that he raises in this federal habeas petition. That court denied Petitioner's claims and affirmed judgment on February 11, 2009. Petitioner raised the same two issues to the California Supreme Court in his petition for review. The California Supreme Court summarily denied the petition for review on April 22, 2009.

Petitioner filed the instant federal habeas petition on June 10, 2009. Respondent answered the petition on January 21, 2010. Petitioner filed a traverse on January 25, 2010.

//

## IV. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. See 28 U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1994); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. See Lindh v. Murphy, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U.S.C. 2254(d).

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer v. Andrade, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Id. (citations omitted). Under the unreasonable application clause, a federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." See Williams v. Taylor, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is an objectively unreasonable application of clearly

established federal law. See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the Supreme Court's precedents are binding . . . and only those precedents need be reasonably applied, we may look for guidance to circuit precedents.").

The first step in applying AEDPA's standards is to "identify the state court decision that is appropriate for our review." See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005). When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). In this case, the last reasoned decision was from the California Court of Appeal on direct appeal.

## V. ANALYSIS OF PETITIONER'S CLAIMS

### A. Claim I

In Claim I, Petitioner argues that the trial court erred in defining imperfect self-defense to the jury in its instructions. The California Court of Appeal analyzed this Claim and stated the following:

> The jury was instructed on the heat of passion voluntary manslaughter and imperfect self-defense. Regarding heat of passion voluntary manslaughter, the jury was instructed with Judicial Council of California Criminal Jury Instructions (2007-2008), CALCRIM NO. 570. CALCRIM No. 570 provides that a killing based on sudden quarrel or the heat of passion is voluntary manslaughter so long as the defendant was provoked and "acted rashly and under the influence of intense emotion that obscured his/her reasoning or judgment . . . ." CALCRIM No. 570 also defines the necessary provocation as that which "would have caused an ordinary person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment."
>
> For imperfect self-defense, the jury was instructed with CALCRIM No. 571. CALCRIM No. 571 states in pertinent part: "The defendant acted in (imperfect self-defense [or] imperfect defense of another) if: [¶] 1. The defendant actually believed that he/she [or] someone else/____ was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."
>
> Finally, the jury was instructed with CALJIC NO. 3.32. CALJIC

6

3.32 (2005 ed.) provides: "You have received evidence regarding a [mental disease] [mental defect] [or] [mental disorder] of the defendant _____ at the time of the commission of the crime charged [namely, [murder and voluntary manslaughter]. You should consider this evidence solely for the purpose of determining whether the defendant _____ actually formed [the required specific intent,] [premeditated, deliberated] [or] [harbored malice aforethought] which is an element of the crime charged . . . ."

Defendant contends these three instructions collectively misstate imperfect self-defense by failing to inform the jury that imperfect self-defense "need not be based on evidence which would satisfy a reasonable person of the need for self-defense." His point is not well taken.

Imperfect self-defense applies when the defendant actually believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and actually believes the acts which cause the victim's death are necessary to avert the threat, but at least one of these beliefs are objectively unreasonable. (People v. Humphrey (1996) 13 Cal.4th 1073, 1082; In re Christian S. (1994) 7 Cal.4th 768, 773-774, 783; People v. Flannel (1979) 25 Cal.3d 668, 679.) Imperfect self-defense negates malice aforethought, reducing homicide which would otherwise be murder to voluntary manslaughter. (People v. Humphrey, supra, 13 Cal.4th at p. 1082.)

Defendant argues CALCRIM No. 5.71 fails to take into account cases such as his, where his perception of the need for self-defense was influenced by his mental illness. He notes in People v. Wright (2005) 35 Cal.4th 964, the California Supreme Court left open the issue of whether imperfect self-defense applied in situations where the defendant's "actual, though unreasonable, belief in the need to defend himself was based on delusions and/or hallucinations resulting from mental illness or voluntary intoxication, without any objective circumstances suggestive of a threat." (Id. at p. 966.) Defendant relies on Justice Brown's concurrence in Wright, which noted the difficulty of applying the doctrine of imperfect self-defense as it was construed in Flannel to a defendant whose belief in the need for self-defense was based on delusion. (See id. at pp. 982-985 (conc. opn. of Brown, J.).) Asserting delusion was not a proper basis for imperfect self-defense, Justice Brown's concurrence was concerned with the difficulty in imputing malice in such situations because the defense was a judicial construct. (Id. at p. 984.) The concurrence concluded with a call to the Legislature to address the matter. (Id. at pp. 985-986.)

Defendant argues the Wright opinions demonstrate the relationship between mental illness and imperfect self-defense remains an open question. According to defendant, CALCRIM No. 571 is unclear over the issue of whether imperfect self-defense is judged by how a reasonable person views events or how they are subjectively

7

viewed by defendant. He asserts the jury should have been instructed "that for purposes of imperfect self-defense, the reasonableness of the defendant's belief should be judged by the presence of objective but misleading criteria, such as circumstantial evidence which (as here) could be misconstrued as threatening."

In People v. Mejia-Lenares (2006) 135 Cal.App.4th 1437, the Court of Appeal for the Fifth Appellate District concluded that imperfect self-defense could not be predicated on psychotic delusions. (Id. at p. 1454.) Defendant argues his case is distinguishable from Mejia-Linares, as his defense was not based on pure delusion, having some grounding in reality, the alleged mutual combat between defendant and Brooks.

Even if he is correct, the distinction does not help defendant. CALCRIM No. 571 does not define imperfect self-defense in terms of objective reasonableness. Under CALCRIM No. 571, the defense clearly applies whenever defendant's belief in the threat of imminent peril or in the need to use deadly force was unreasonable. This point is clarified by other language in CALCRIM No. 571 informing the jury that: "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant," and "The difference between complete (self-defense/ [or] defense of another) and (imperfect self-defense/ [or] imperfect defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable."

To the extent that defendant's belief in the need for self-defense was the product of any delusions, we follow Mejia-Lenares and conclude the doctrine of imperfect self-defense does not apply. We also find that CALCRIM No. 571 does in fact allow the jury to consider defendant's subjective perceptions of his need for self-defense, even those influenced by his mental illness, when addressing whether imperfect self-defense reduces the murder to voluntary manslaughter. [FN 1] Justice Brown's concurrence in Wright is simply irrelevant to determining whether CALCRIM No. 5.71 accurately reflects the law.

[FN 1] The other instructions given do not change our analysis. The definition of voluntary manslaughter in CALCRIM 570 has no bearing on the jury's consideration of imperfect self-defense in CALCRIM No. 571 as the two instructions address entirely distinct means of reducing murder to manslaughter. CALJIC No. 3.32 is a pinpoint instruction allowing the jury to determine whether defendant's mental illness, disease, or disorder negated malice or other mental elements of the crime charged. (People v. Moore (2002) 96 Cal.App.4th 1105, 1115-1117.) It does not address how the jury evaluates imperfect self-defense.

As we have already explained, the instructions given by the court properly defined imperfect self-defense. While the prosecutor

8

> argued to the jury that manslaughter applied only to reasonable acts, he did so in the context of defining heat of passion voluntary manslaughter, which is based on a reasonable person standard. The prosecutor's brief reference to imperfect self-defense in the closing argument did not even mention the reasonable person standard. Defendant does not assert prosecutorial misconduct, and the prosecutor's legally permissible arguments do not taint the proper definition of imperfect self-defense contained in CALCRIM No. 571.

(Slip Op. at p. 6-11.)

A challenge to a jury instruction solely as an error of state law does not state a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. See id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S 152, 169 (1982). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), which is whether the error had substantial and injurious effect or influence in determining the jury's verdict. See, e.g., Hedgpeth v. Pulido, 555 U.S. 57, 129 S.Ct. 530, 532 (2008) (per curiam).

Petitioner argues that the jury instructions on imperfect self-defense improperly shifted the burden of proof such that he was required to show that his belief for self-defense met the "reasonable person" standard. The California Court of Appeal's decision aptly analyzed Petitioner's argument within Claim I. As it noted, the imperfect defense instruction as stated by the trial court and found in CALCRIM 5.71 does not set forth the "reasonable person" standard as Petitioner argues in his petition. Instead, it provides that the jury is to evaluate defendant's

beliefs using all of the circumstances "as they were known and appeared to the defendant." (Clerk's Tr. at p. 296.) This instruction illustrates that the trial court did not define imperfect self-defense under an objective reasonable standard as Petitioner argues in his federal habeas petition.

Petitioner also argues that the prosecutor conflated the heat of passion manslaughter and imperfect self-defense manslaughter during his closing arguments. However, as noted by the California Court of Appeal, the prosecutor's statements to the jury during his closing arguments related to the heat of passion manslaughter issue, not to imperfect self-defense. Petitioner does not argue that a "reasonable person" standard does not apply to the heat of passion instruction. The jury was separately instructed on heat of passion manslaughter and imperfect self-defense manslaughter. (See id. at 296, 303.) The jury is presumed to have followed these instructions. See Weeks v. Angelone, 528 U.S. 225, 334 (2000). For the foregoing reasons, Petitioner fails to show that the California Court of Appeal unreasonably applied clearly established federal law and/or that it resulted in a decision that was based on an unreasonable determination of the facts. Petitioner is not entitled to federal habeas relief on Claim I.

B. Claim II

In Claim II, Petitioner argues that his mental condition prevented him from testifying on his own behalf at trial. The California Court of Appeal analyzed this Claim on direct appeal and stated the following:

> Before the trial, defense counsel declared a doubt as to his client's competency to stand trial. A report from Dr. Burnstein, prepared on the same date as counsel's declaration, stated defendant was "significantly compromised in his ability to confer" with his counsel and was incompetent to stand trial.
>
> The court appointed two experts, Dr. Warburton and Mark Hoffman, PH.D. Both experts concluded that defendant suffered from paranoid schizophrenia, but was competent to stand trial. Dr. Warburton reported defendant expected to testify, and to act competently when testifying, but if counsel did not want him to testify, defendant would go along with that decision.

10

The jury returned its guilty verdict on November 28, 2006. In less than two weeks his condition sharply deteriorated, causing him to be placed in isolation on suicide watch.

On January 24, 2007, defense counsel moved to suspend proceedings based on defendant's alleged incompetency to assist in his defense. In support of his motion, defense counsel attached a declaration stating that when he visited defendant one week after the trial, defendant's first comment was, "I am ready to testify . . . Is now the time for me to testify?"

The court appointed two additional experts. One expert confirmed defendant was suffering from paranoid schizophrenia but was competent to stand trial, while the other found defendant had a mental disorder and suffered auditory delusions, hallucinations, impaired judgment, and lack of insight, but he was still competent to be tried.

A third new expert, Paul Good, PH.D., interviewed defendant and found that "if at the time of trial Mr. Maggio was functioning as well as he is today, it is my opinion that he would have made a good witness on his own behalf." The expert attributed the improvement in defendant's mental condition to changes in his medication in December 2006. Dr. Burnstein interviewed defendant again and agreed with Dr. Good's conclusions. Based on these new reports, defendant subsequently amended a new trial motion to include his alleged incompetency to testify on his own behalf at trial on grounds for a new trial. The court denied the motion.

Defendant notes that he has a constitutional right to testify on his own behalf. (Rock v. Arkansas (1987) 483 U.S. 44, 51 [97 L.Ed.2d 37, 46].) While he was found competent to stand trial, defendant claims the standard for determining competency to be tried does not address whether a defendant is competent to testify on his own behalf. He concludes there was sufficient evidence showing he was not competent to testify at the time of trial due to his mental illness, and the court therefore should have granted him a new trial so he could exercise his fundamental right to testify in his own defense. We disagree.

State and federal due process bar the trial or conviction of a mentally incompetent defendant. (People v. Rogers (2006) 39 Cal.4th 826, 846.) To be competent, an accused must have the present ability to understand the nature of the proceedings against him, to consult with counsel, and to assist in preparing a rational defense. (Drope v. Missouri (1975) 420 U.S. 162, 171-172 [143 L.Ed.2d 103, 113]; § 1367, subd. (a).)

The court appointed experts and inquired into defendant's competency to stand trial after counsel raised doubts about

11

defendant's competency. After both experts examined defendant and concluded he was competent, the court found defendant competent to stand trial. Defendant does not and cannot claim that he was incompetent to stand trial.

During closing argument, defense counsel made the following statement about defendant's failure to testify: "The reason why I didn't let him testify is because he is mentally ill." The court sustained the People's objection, and counsel continued to argue that defendant did testify through the transcripts and videotape of his interview. The court declared a recess and examined defendant outside the jury's presence.

Responding to the assertion that defendant did not testify because he was mentally ill, the court asked defense counsel if he explained to defendant his right to testify. Defense counsel replied that he had. The court asked defendant if he understood the choice to testify was his to make. After defendant said he did, the court asked counsel whether defendant understood the right to testify was "his own personal right [.]" Counsel told the court, "Just to make it clear, of course we did. But we also discussed the fact that he's mentally ill and on medication." The court replied, "That's fine. So the record is clear that Mr. Maggio understood it's his right to make that decision or not, and he decided not to testify." Counsel replied, "He's clearly competent, Judge, and capable of making that decision, and he did." The colloquy concluded with defendant affirming he had made the decision not to testify.

The colloquy establishes there was no violation of defendant's right to testify as he was informed of and personally waived this right. (People v. Bradford (1997) 15 Cal.4th 1229, 1332.) Although defendant's trial did not violate either to testify or his right to be tried while competent, defendant endeavors to mix these two rights into a new right to be competent to testify.

Some defendants will be less effective witnesses than others for a variety of reasons such as a prior criminal record, nervousness, an inability to articulate, or mental illness. The federal Constitution takes this into account through the Fifth Amendment, which protects the defendant's right not to testify. One of the rationales of the Fifth Amendment self-incrimination privilege is to protect defendants who would be poor witnesses if forced to testify. (Carter v. Kentucky (1981) 450 U.S. 288, 299-300 & fn. 15 [67 L.Ed.2d 241, 250-51 & fn. 15]. If defendant was a poor witness due to his mental illness, then the Fifth Amendment prevented the People from forcing him to testify and thus weaken his case, and due process ensures that he alone may make the decision of whether to testify, with the advice of counsel when appropriate.

Defendant was competent to understand the charges against him and assist in his defense. He had the right to testify, but if

12

>     defendant felt he would not make a good witness, the prosecution
>     could not compel him to testify.  His choice not to testify was
>     clearly his, and he was competent to make that decision.  Whether
>     his mental illness made him a poor witness is of no constitutional
>     significance.

(Slip Op. at p. 11-16.)

"[T]he conviction of an accused person while he is legally incompetent violates due process." Pate v. Robinson, 383 U.S. 375, 378 (1966). To be competent to stand trial, a defendant must have the "capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." Drope v. Missouri, 420 U.S. 162, 171 (1975).

Before trial, two court appointed experts, Dr. Warburton and Dr. Hoffman, submitted reports to the trial court that Petitioner was competent to stand trial after Petitioner's competency to stand trial became an issue. (See Clerk's Tr. at p. 57 & 71.)  Specifically, Dr. Warburton found that Petitioner was able to assist counsel in the conduct of his defense in a rational manner. (See id. at p. 72.)  Despite these findings by the court-appointed experts, Petitioner argues that his right to testify was violated because his mental illness prevented him from testifying. (See Pet'r's Pet. at p. 64.)

During closing arguments, Petitioner's trial counsel stated to the jury that the reason he "didn't let [Petitioner] testify is because he's mentally ill." (Reporter's Tr. at p. 712.)  After the prosecutor's objection was sustained, the court conducted the following colloquy outside the presence of the jury:

>     THE COURT:  Mr. Thomas . . . [y]ou said in your closing
>     arguments the reason, quote, the reason I didn't let him testify is
>     because he's mentally ill.  And I just want to make sure so that the
>     record is clear, Mr. Maggio, you explained to Mr. Maggio that it is
>     his right to decide whether or not to testify in this case, correct?
>     MR. THOMAS:  Absolutely.
>     THE COURT:  And he understands that it is his right.  In other
>     words, whether you think it's good, bad or otherwise, it doesn't
>     really matter.  Mr. Maggio gets to make the decision whether or
>     not he testifies – to testify.  Do you understand that, Mr. Maggio?
>     THE DEFENDANT:  Yes.

13

1    THE COURT: And you thoroughly discussed that with your attorney?
2    THE DEFENDANT: Yes.
3    THE COURT: Mr. Thomas, you clearly discussed that with your client. He understood it's his own personal right?
4    MR. THOMAS: Just to make clear, of course we did. But we also discussed the fact that he's mentally ill and on medication.
5    THE COURT: That's fine. So the record is clear that Mr. Maggio understood it's his right to make that decision or not, and he decided not to testify.
6    MR. THOMAS: He's clearly competent, Judge, and capable of making that decision, and he did.
7    THE COURT: That's a decision you made, Mr. Maggio?
   THE DEFENDANT: Yes.

(Id. at p. 714-15.)

Petitioner's attempt to manufacture a separate right to be competent to testify even though he was found to be competent to go to trial and expressly waived his right to testify at trial is unavailing. The doctor's reports cited above indicated that Petitioner had the ability to understand the proceedings and assist counsel at trial. Furthermore, the above colloquy between the trial court, Petitioner's trial counsel as well as Petitioner clearly established that Petitioner was aware that the right for him to testify at trial was his decision to make. Petitioner expressly stated on the record that he understood that right and expressly waived that right to testify on his own behalf at trial.

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." Rock v. Arkansas, 483 U.S. 44, 49 (1987). Because the right it is personal, it may be relinquished only by the defendant himself, and his relinquishment of the right must be knowing and intentional. See United States v. Pino-Noriega, 189 F.3d 1089, 1094 (9th Cir. 1999). A defendant's waiver of the right to testify need not be explicit, and may be inferred from his failure to testify or to notify the trial court of his desire to do so. See id. at 1094-95. Additionally, "[a]lthough the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify." United States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993). "[I]f the defendant wants to

14

testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." Id. Thus, "[w]hen a defendant remains 'silent in the face of his attorney's decision not to call him as a witness,' he waives the right to testify." Pino-Noriega, 189 F.3d at 1095. In this case, Petitioner did not stay silent on his right to testify. He expressly stated on the record that he understood that the right to testify was his. He expressly waived the right to testify on his own behalf on the record. As noted above, Petitioner was found to be competent to stand trial. In light of this evidence and for the reasons cited by the California Court of Appeal, Petitioner fails to show that the state court decision was an unreasonable application of clearly established federal law on Claim II. Thus, he is not entitled to federal habeas relief on Claim II.

## VI.  CONCLUSION

For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

//

1  DATED: September 12, 2011

                                    _____
                                    TIMOTHY J BOMMER
                                    UNITED STATES MAGISTRATE JUDGE